We'll hear the case of Biocad v. Hoffman La Roche. Thank you, Your Honors, and may it please the Court, David Frederick for Biocad. Biocad adequately pleaded antitrust injury in claiming that defendants engaged in a series of anti-competitive steps to block Biocad's entry into the U.S. market to compete with cancer drugs. The District Court erred in dismissing the complaint for three reasons. First, on antitrust standing, the District Court improperly imposed a pleading requirement of probable FDA approval. Second, on the application of the Foreign Trade Antitrust Improvements Act, the Court did not properly apply this Court's directed-at test for imports, and it imposed too strict a standard of directness for domestic effects. And third, the Court drew no reasonable inferences in favor of Biocad, which led it to disregard the implications of key facts, most notably Biocad's investments in creating an FDA-compliant laboratory to make its biosimilars and the fact that it already is competing with defendants in other countries for sales. The District Court's erroneous ruling enables the defendants to perpetuate their monopoly in a multibillion-dollar sale of cancer drugs in the United States against its only competitor around the world for three of these biosimilars. Now with respect to the antitrust injury, this, we would submit, is the key. The test, as it has been traditionally applied for 100 years, is a two-fold test, intent and preparedness. The factors for preparedness go to the background and experience in the field. Here, Biocad pleaded that it was the only worldwide competitor to have developed three of these biosimilars, having spent six years doing so. Financial capability, here Biocad had invested millions of dollars, including setting up a U.S. business for the purpose of facilitating its imports, and actual and affirmative steps to entry, such as the implementation of contracts and the development of a worldwide trade. Are you saying, just, are you saying, so that I'm clear, that we should adopt the tests of other circuits with respect to intention and preparedness? For example, the Fifth Circuit's case, opinion in Sanger Insurance Agency versus HUB International, which lays out four different indicia. The plaintiff's background and experience in the prospective business, the ability to finance entry, you've talked about those two, particularly to finance facilities and equipment, the consummation of contracts related to the potential entry and other affirmative action by the plaintiff to engage in the proposed business or new market. Your Honor, those are factors that go to intent and preparedness. I don't think that we take the position, and you shouldn't take the position, that there is one set of factors that automatically accounts for intent and preparedness. That intent and preparedness standard has been around since the American banana, you know, a century ago. And the idea is that in different ways, those factors all point to the fact that BioCAD had an intent and was prepared to take the necessary steps to enter a market where it required a very large investment. And because BioCAD is the only worldwide competitor with the defendants as to these three biosimilar drugs, Roche had a perfect incentive to try to crush BioCAD in its home market to cut off its ability to generate the sales necessary to finance the investment for entry into the U.S. market. What's the allegation with respect to the likelihood of FDA approval? The likelihood of FDA approval, I think, goes to different factors. It is true that we did not plead that we had begun the process of formally applying to the FDA, but just like the seven No matter how much intent there is to enter, you can't enter unless there is FDA approval. That's correct, Judge Kearse. However, the district court did not credit or give reasonable inferences to the following allegations. We had spent six years developing these biosimilars and were the only drug company in the world to be able to do so. Second, that we had spent 18,000 hours developing quality control so that we would have a lab to produce these biosimilars that would comply with FDA standards when we got to the point of making that formal application. Now, as we cite cases in the district courts on pages 37 and 38, no court other than the court below has imposed a requirement of application for FDA approval as a requirement for intent and preparedness. And the Exakim case, we cite the district court case from the Northern District of Illinois, points out that the competitor had been selling drugs around the world but had not even made an application for an abbreviated new drug application. That case, importantly, went up on appeal in the Seventh Circuit in a decision by Judge Easterbrook, I believe, noted that there had not been an application yet for the FDA, but yet the Seventh Circuit nonetheless found that there was a proper pleading of antitrust injury. So we don't think that is the proper rule that the district court applied, and had it given reasonable inferences for the other allegations, we easily surmount the point of antitrust injury. Now, at the pleading stage— I understood your—correct me if I'm misunderstanding. The amended complaint explicitly alleges that BioCAD—and I'm quoting—anticipated FDA approval and such FDA approval is probable. It did plead that, and the district court discredited that direct pleading by saying the court did not think that there were other facts that would support that. So if there is a requirement for pleading probability FDA approval, we certainly pleaded that. But you pleaded it without saying that there's any application. Correct. We did it with all the other factors. And keeping in mind, Judge Kearse, this is a company that's selling this drug in dozens of other countries, has developed a portfolio of sales into the tens of millions of dollars in those other countries, and so the question about intent and preparedness is one that has to be looked at more expansively than simply has an application been filed for the reasons that the district courts in those cases—and I'm talking about ExaChem, RetroPhen, Tofilis—discuss and explain. How does the, if at all, the Biologics Price Competition and Innovations Act of 2009 figure into your story? Well, that act was designed to make it easier to compete on the biosimilar front while containing a set of requirements that a biosimilar had to fulfill in the way of testing and the like. So there's no allegation here that there was noncompliance with that. That simply sets the standards for determining when a biosimilar is deemed to be equivalent. Keeping in mind, Chief Judge Katzman, we're talking about very complicated proteins, and one of the things that has to happen in order for that biosimilarity to occur is for there to be elaborate testing with the product that is being made similar to. And that one of the arguments that we made in the complaint that we pleaded was that the defendants had constricted the availability of those comparative samples and thereby engaged in an anti-competitive act in the United States that supplemented their anti-competitive conduct that occurred in Russia, all directed at limiting BioCAD's ability to import its biosimilar once it had obtained the necessary approval. Let me ask you, if I might, about the FTAIA. You say in your brief that the phrase conduct involving commerce, conduct involving import commerce in that act means conduct involving conduct that is intended to affect and does affect import commerce. But the word involving in the statute also modifies the phrase trade or commerce with foreign nations, which then determines what conduct is subject to the FTAIA, as I understand it. And so in reading involving the way you ask us could arguably expand the reach of the FTAIA itself. Let me give you, if I could, a hypothetical. Let's say that an American company, let's call it company X, has a monopoly on some product in Russia. But it's competing with company Y here in the U.S. market. And it worries that company Y may try to enter the Russian market. So company X decides to start undercutting company Y's prices in the U.S. and gives kickbacks to American doctors and engaging in other anti-competitive behavior in the U.S., all with the intent of maintaining its Russian monopoly by crippling Y's financial ability to enter the Russian market. Now all that conduct that I've described is taking place in the United States and its direct effects are felt here. But it's intended to affect and does affect trade with a foreign nation. So wouldn't that domestic conduct suddenly fall under the FTAIA, under your reading of the word involving? No, because it's directly affecting the export market. One of the things that I think that is important to look at is what was Congress... Could you say more about that? Yes. So the Seventh Circuit en banc in Minchem had a very nice explanation of what Congress was trying to get at with this FTAIA statute. In your hypothetical, the way you would analyze the question is you would look at was there a direction of the activity at exports? And if it was, under the way the Minchem analysis would be, it just falls outside of the FTAIA and you look at it under normal substantive Sherman Act standards. And I would submit that the same analysis applies here in reverse because what the directed at language, and this is from, Your Honor, your opinion in the Crewman case where you looked at the standard for what constitutes an import for this purpose and the test the Second Circuit adopted was directed at. We're perfectly fine applying that standard here. We're not asking you to change that standard at all. And if you look at what the defendants here are trying to do, their actions really are directed at the imports because that's what they are trying to protect against. They know they have a $9 billion profit nut here in the United States that they are trying to protect. The only competitor around the world who can conceivably threaten that monopoly is in Russia. And so undercutting the market in Russia is the way of starving Biocad at the capital necessary to become a viable competitor in the market that they most care about, which is the one here in the United States. And that's why the complaint alleges wildly vast different price differentials between what the defendants are charging in the United States for their anti-cancer drugs and what they are charging in Russia. Is it your argument that the Biocad's exclusion from the market is by itself an anti-competitive domestic effect within the meaning of the FTAIA or is the relevant domestic effect the decreased output that results from Biocad's exclusion? They both go hand in hand. The exclusion is the antitrust injury and effect that we are talking about here. That then by economic terms has the effect of decreasing the amount of competitive product and thereby allowing the defendants to charge super competitive prices here in the United States. Where the district court erred, however, was in thinking that the complaint was only alleging the heightened prices here in the United States. The injury is the exclusion from the market and the exclusion from the market then has those corollary economic consequences. Isn't that a rightness issue? It's not framed as a rightness issue, but we're not there yet. I mean, you're not even in the market yet. We don't know for sure that you will be in the market. The question is at the pleading stage, Judge Chin, are we allowed to, are we foreclosed from even bringing our claims to show that the development and as we cite, multiple court cases have allowed the antitrust injury to be alleged without any filing of an FDA application. And the reason is that you look at this problem contextually. And that's why if you were to affirm you would be the only court that would hold that this FDA approval standard is a it is unripe in the sense that facts have to be developed. But that's why this case coming as it does under Rule 8's pleading standards simply requires notice of what the theories of the plaintiff are and that the reasonable inferences have to be drawn in the plaintiff's favor. The district court didn't do that. Going back for a second to, going back to a second to the question that I was raising about whether it's exclusion from the market by itself an anti-competitive domestic effect or whether the effect is the development, the relevant domestic effect is the decreased output. And you say they go hand in hand. So how does the decreased output cause BioCADS exclusion? It seems that they're both effects really of the same cause. BioCADS exclusion rather than the decreased output causing lost profits. If I understand the question, Chief Judge Katzman, I may not fully understand it. So if I start this down a road and we're not speaking to each other directly, please interrupt and help me clarify. The defendant's conduct here which is at issue is their exclusion, their attempted exclusion from the market. That has the effect of precluding BioCADS from being able to participate in the market. Now one effect of that is to make the availability of these cancer drugs under the sole control of the defendants. To the extent that that is an effect cognizable which we submit it is as an antitrust injury, it clearly qualifies on the injury side and it also qualifies under the FTAIA as a significant domestic effect. So to that extent you're really looking at things that go hand in hand. To the extent that what it also enables the defendants to do is to raise their prices to super competitive levels, the complaint alleges that that in fact happened at the time when BioCADS emerged as a potential competitor in Russia became clear in the 2014-2016 period after BioCAD had obtained approval from the Russian authorities to begin selling these biosimilar drugs and when BioCAD entered into contracts around the world for the sales of these biosimilars. So I think that from the perspective of which lens you're looking at really does turn in to whether it pertains to the application of the statute side. What we do know is that the statute was not designed to change the function of how antitrust law applied for foreign conduct that was directed at the United States and that's where we're in the heartland of that now. What it was designed to do is to avoid the problem of having courts try to look at anti-competitive conduct that didn't have those effects in the United States. Thank you. Unless the court has further questions at this time I'd like to save some time for rebuttal if the court permits. Yes, you have three minutes for rebuttal. Good morning. May it please the court. Dan Wall. I represent Genentech but I'm arguing for all of the appellees. I'd like to make three points. One, a record correction. Then some comments on the FDIA and then finally finishing with standing issues if there's time. So on the state of the allegations and what this case is about, I just want to point out that there's a very artful phrase that is used over and over again in the complaint about how BioCAD is the only company in the world that competes with the defendants in all three of these cancer drugs that are at issue. All three. The reason that's important to focus on that is because the complaint does not allege and could not allege that the defendants lack competition in the three drugs overall or from other biotech companies who make one or two of the drugs. In fact, as we come here today Is there other competition with respect to each of the drugs by some entity or another? So all of the drugs remain on patent. However, as we stand here today, the FDA has already approved Mylan's biosimilar that references Herceptin and Amgen's biosimilar that references Avastin. And two weeks ago, an FDA committee voted 16 to 0 to propose to the FDA that it approve Celtrion's proposed biosimilar referencing Rituximab. So there is, as soon as the drugs are off patent, there will be competition in the United States for all of them. And BioCAD very cleverly tried to plead around that by saying that they were the only one who was making all three. But of course, from the perspective of the interests of competition, who cares? As long as they are out there. Now, turning to the FDAIA, I think it is impossible to get this case right without grounding the analysis, as Judge Sullivan did, in the allegations of anti-competitive conduct in Russia. Those are summarized at paragraph 119 of the complaint, at A143. And they are as Russian as you could get. There is a very unusual theory of predatory pricing in Russia, which not only combines low pricing, but is intertwined with Russian regulations on posting of drug pricing. There is commercial bribery of professionals employed by the Russian government. There is fraudulent bidding on Russian government contracts. There is conspiracy with employees of the Russian Ministry of Health to exclude BioCAD from the Russian health insurance program. And there is a unique tying claim affecting Russian cancer patients. The brief of BioCAD tries to say that most, but not all, of the conduct is in Russia. But that's not true. All of the conduct that is alleged to create any injury occurred in Russia. The only exception to the Russian conduct is the theme of limiting distribution that you will find at paragraphs 181 to 191 of the complaint, at A161 and 162. And which are also addressed in footnote 6 of Judge Sullivan's decision. And this is the idea that the distribution system of Genentech was limited in some way to make it harder to get reference samples to go forward with the FDA process. But you will search those paragraphs in vain for any allegation that BioCAD tried, but was unable to get reference samples. And obviously, since we come here today with applications for all of these drugs on file and two of the three already approved, there's a way to get reference samples out in the world. So that doesn't actually contribute to their cause of action. Their cause of action is 100% rooted in what happened in Russia. Now, Russia does have a competition law. It's rooted in what happens in Russia. I understand that. But the idea is that the conduct would bankrupt, ultimately bankrupt rivals in the process, making it impossible to file for FDA approval. Right. So let's follow the path. I think that's what we should do. Because the FDA gives us the tools of how to deal with this. And while it can be complicated, I actually think that it comes down... It is complicated. It is. And by the way, don't forget when you write your opinion that it's now become de rigueur to say that it's complicated in every opinion. It's a very funny... We'll try to remember that. It's an odd structure. But remember that what you're dealing with is a pair of complementary rules that are supposed to deal with two easy cases and then all other cases in between. The two easy cases are when we are actually dealing with import transactions and export transactions. And why are they easy? They're easy because by definition, one foot is in the United States. And as a result of that, the interest in the United States in being able to regulate that with its antitrust laws without interfering with the sovereign interests of other nations is clear. And in those instances, the Court doesn't have to go through an effects analysis or substantiality or anything else. It simply has to do what this Court did in the Cruman case, which is identify the conduct as one that is acting upon the import transaction. But let's then go through the list here. But if you look under BioCAD's interpretation, the domestic effects exception, at least as I understand it, would apply to foreign conduct that doesn't have the ultimate goal of restricting import commerce and doesn't immediately act upon the import commerce, but still has a reasonably proximate nexus to import, domestic, or export commerce. Why isn't that a workable distinction? I don't think it is the distinction that Congress adopted. What Congress wanted to say is in these easy cases of exports and imports, where the conduct by definition is partially in the United States, we do not need to go through what is really the core of the FTAIA, which is the direct effects exception, 6A1 and 6A2, and the idea of are the effects direct, foreseeable, substantial, and is the injury that is being complained of the secondary effect of the U.S. effects. We have these easy cases because the conduct, as in the Christie's auction case that you covered in Cruman, is either is or is not on the import transactions themselves. In that case, you held that it was not. That doesn't mean the plaintiff is out of court. It doesn't mean the U.S. doesn't care about that conduct. All it means is it has to go through the filters of 6A1 and 6A2, which is not an unreasonable thing because that's where Congress did its work in the statute to try to synthesize and to some degree modify the prior law around the 6A1 and 6A2 concepts. Now, below, BioCAD took the position that this was solely an import exclusion case, and they made this essentially intent-based argument that even though obviously a bribe to keep BioCAD out of the Russian health care program is not an import restraint, that we could treat it as such by simply having an intent allegation which says that it is. That's not either a sensible usage or a reasonable usage of the word involves, nor is it what this Court used, interpreted the words to mean in Cruman. It's very interesting. We actually had a battle of the dictionary definitions in the briefs here, and we came forth in our brief saying that involves should mean includes or contains, and Mr. Frederick came back in his brief saying that it should mean affects or implicates, because you can find those in the dictionary as well. But do you notice that all of those terms are about the objective relationship between things? None of them are about the subjective relationship between things. And Congress could have put involves or was intended to affect, but that's not what they did. And all of the decisions that look at the conduct for what it is approach, including in Cruman. What about, you've got the, in 2017, the FTC and the antitrust division issued guidelines for international enforcement and cooperation. Yes. And there they say in the guidelines, conduct may involve import commerce even if it is not directed specifically or exclusively at import commerce. Yes. And quite frankly, I disagree with that. I think that to the extent that it doesn't involve it, it has to go through the directive effects exception. And, you know, my colleagues in the antitrust division, I respect very highly, but they're in the prosecution business and they've been frequently on the other side of these issues, and they take a somewhat expansive view. But if you look at what this Court has held and what the word means, it cannot be based upon some attenuated effect because the statute directs all effects analysis through 6A1 and 6A2 and structures it that way. Now when we turn to that, I think there's two parts of it. There's 6A1 and there's 6A2. I don't think that the Court could find a better candidate for finally addressing what it means to have a direct effect than this one, where you are presented with a complaint which is 100 percent about exclusionary conduct that occurred in Russia, far removed in time and place from the alleged effects that occurred in the United States. The reasonable proximate causal nexus is the standard that was adopted in the Loetz decision, and a number of proximate cause factors are mentioned. Let's just go through them very quickly. Now in Loetz, I think it's also important to keep in mind that the object of the conspiracy in that case was a foreign market. The conduct occurred in a foreign market. The plaintiff's theory in Loetz was that the United States is the largest consumer market for electronic devices, would be firmly in the minds of everyone who was trying to raise the price of USB 3.0 connectors because so much of the demand for them would be here, and they were arguing essentially a pass-through theory that would bring the overcharges into the United States as a matter of inevitability. That is actually a more linear causal chain than what is alleged here. It's much more direct actually than what's alleged here, because what you have here instead is the unlikely proposition that trying to keep them out of the Russian healthcare program is going to have the direct effect of keeping them out of the United States. There are very specific allegations of paying bribes to particular physicians in Smolensk. These are not things that anyone would think that the natural and probable consequences of paying bribes to physicians in Smolensk is that they will be kept out of the United States. There are superseding and intervening causes galore here, not the least of which is the implausibility of that financing thing, because if you take the allegations of the complaint at face value, that there is this incredibly lucrative market and that they are at least one of the unique competitors to get into that, why couldn't they find alternate financing if that is really what the effect of the Russian conduct was, was that it cash-starved them to some extent? I think what's going on here is it elotes, Your Honor wrote that this can't just be but-for-causation. It can't just be anything more than an antecedent event without which the harm in the U.S. wouldn't occur. But that's what we have here. That's what we have here is the most remote, most indirect causal chain that you will find in any reported FDAAI decision. Can I just ask you a question that I asked your adversary? And that is, does your contention regarding the domestic effects exception depend on reading the relevant domestic effect to be increased prices as opposed to BioCAD's exclusion itself or reduced output? So I'm trying to figure out a way to say yes or no to that, but I have to talk around it a little bit. I think that it is absolutely the case that one of the ways to resolve this is just go down the path that you went down in elotes. And the pleaded U.S. effect is higher drug prices. And that's the cognizable effect because the exclusion of one competitor from a market in and of itself wouldn't even be an antitrust offense, let alone one that would lead to consumer injury. You need the reduction in output and so forth that causes a consumer injury. And so I do think that the causal chain is very, very similar to elotes in which the idea is that I'm getting through 6A1 with higher prices in the U.S. and now the problem is there's no credible argument that higher prices in the U.S. cause the injury to BioCAD. But I think there's a second way to do it that also comes from elotes, because elotes not only tells us what you have to say, it tells us what you can't say. And specifically what it says is that you cannot, the plaintiff cannot satisfy 6A2 when its exclusion from the relevant market actually precludes the domestic effect. That's at 753 at 398, and then later on again at page 414 where the Court says that elotes' injury flowed directly from the defendant's exclusionary foreign conduct. Elotes' complaint thus seeks redress for precisely the type of independently-caused foreign injury that Ampagram held falls outside of Congress's intent. Well, one thing we can say with certainty about this complaint is that the single engine of causation is the alleged destruction or suppression, it wasn't destroyed, but the alleged suppression of their Russian business. And therefore, indeed, if you read their complaint broadly, what they're talking about in terms of the United States is one of the places that they weren't able to enter into. It is essentially the consequential damages of their exclusion from Russia. And because the causal chain of that begins so clearly in Russia with acts that are about anti-competitive conduct in Russia with no independent U.S. connection, I think that that is in the wheelhouse of what LOTE says is not allowed under the FTAIA. MR. KNEEDLER. Understanding, understanding question. I note that you haven't, at least in oral arguments, said anything on the standing issue. Would you like to? MR. STEINWALD. Yes. Let me just make two brief comments. I know I'm way over my time. To be crystal clear, we would not be saying that there is a standing problem in this case if everything that the complaint says that BioCAD has done with respect to product development and building plants and so forth was directed at the U.S. market. The reason the standing issue exists here is because this is a company who, up to the time of the complaint, appears to be focused entirely on Russia and on a number of other countries that do not have the standards for biosimilar approval that the FDA has and that the European Medicines  MR. KNEEDLER. They say they've undertaken a number of steps so that they would be able to enter the American market, including making investments in the United States itself. MR. STEINWALD. Right. MR. KNEEDLER. Why at this stage isn't that enough? You may ultimately prevail, but I'm just trying to understand. MR. STEINWALD. Because in the context of this case and in this industry with this regulatory framework, it is inconceivable that a serious entrant could have been at the stage that they were, that filed a lawsuit in 2016, would be unable to say anything whatsoever about what their plan or ability is to get this product through the U.S. or I would even spot them, the European. MR. KNEEDLER. If you were their lawyer, what would you counsel them to do? MR. STEINWALD. Well, I'll give you a number of specific suggestions of things they could have done. I'll start with some that are actually inspired by a single press release that was put out by another one of our biosimilar competitors the same month this complaint was filed. BioCAD could have alleged that their biosimilars were in late-stage phase 3 development and their primary endpoints had been successfully achieved. In other words, they could have alleged the state of their testing. They could have alleged that one or more of the drugs had actually been submitted to the European Medicines Agency for review, which would be very credible because that's not Russia and that's not Tanzania and that's not some of the other countries that they list. They could have alleged that they had a strong U.S. commercial presence in oncology or perhaps a partner who had a strong U.S. presence in oncology. They didn't allege that. Here's one that wasn't inspired by the press release. They could have alleged that they actually sought those reference samples. And I will note that the complaint, their own complaint, alleges that one of their consultants told them that one of the things that they should do in order to get this product ready to bring to the United States was to conduct comparative testings of their product with a reference product. And there's no allegation in the complaint that they did that at all. That's the context in which one has to consider what Judge Sullivan ruled. He did not, as what he said, you have not alleged anything at all, which he followed up with what seemed to me to be just a number of examples that he was throwing out there of things about an FDA process that one might have pled, none of which were pled here. None of which were pled here. And yes, I agree with Mr. Frederick. This is actually a totality of the circumstances to try it kind of a standard. I think Judge Sullivan was very careful not to require allegations of actual FDA approval, but he was saying still in this context, someone who's claiming to be real in the United States would have been able to give me something, something at all on the regulatory side of their plan. Thank you. You'll have three minutes. Thank you, Your Honor. Let me start with standing because it was an afterthought until you raised the question. If you accept the proposition that the defendants are seeking to protect a $9 billion profit stream, the U.S. market is the key for any worldwide company that is seeking to develop these biosimilars. That is what BioCAD did. And if you look at the timeframe, which as pleaded in the complaint is 2016, that's when BioCAD got the second and third of its biosimilar approvals in Russia. And it was at exactly at that point that the pricing structure by the defendants changed. At that time, it raised the prices in the United States to help subsidize the decrease in the prices that it was charging in Russia. It was as alleged in the complaint, direct cause and effect. As a standing matter, clearly being precluded from the U.S. market is antitrust injury. And the way that you get antitrust injury is through choking off the ability of a foreign company to import into the United States. And once you accept that as a standing matter, then all the facts that the other side would like you to be considering really are irrelevant at the pleading stage. They're going to get their opportunity to develop their facts. They're going to get their opportunity to argue for summary judgment that there was an approximate cause. But that's not appropriate to do at the pleading stage. And notably, nowhere has Mr. Wall today defended what the district court said with respect to standing, which is that we had to plead a lot of facts that went around the FDA approval process. That's never been the standard and that has never been accepted by any other court other than the district court below in this case. So once you've accepted our argument with respect to antitrust standing, then the FTAIA issues sort of fall together because we meet the import chapeau provision because the actions here clearly are directed at our ability to import into the United States. And under the Lotus decision and under MNCAM in the Seventh Circuit, that is enough to take us completely out of the FTAIA land. And you don't really need to say more about it than that unless you want to. Now what is being argued here are a lot of facts that are outside the pleadings. There's no rule of antitrust law that simply because there might be some other competitors emerging, that enables you to engage in the anti-competitive acts against one of your competitors. And that's what our suit here alleges. So the idea that they can get away with kneecapping BioCAD in Russia as a way of protecting, even if it's only protecting for another year or so, their market stream is a multi-billion dollar protection of their monopoly profit stream. And that is what we are seeking to protect here. Chief Judge Katzman, we agree with your reading of Lotus to the extent that it is talking about what is being directed at. And the object of the conspiracy, as we have pleaded it here, was to protect their U.S. market and their revenue stream here. And so we believe that under a proper reading of Lotus, where the object of the conspiracy there was to create exclusion in the Chinese market, that's different than what is proximately causing the problems here, which is an object to conspire to protect their U.S. profit stream in this situation. Unless the court has further questions, we'll submit. Thank you both for your arguments in this difficult case. The court will reserve decision. The last case is on submission. The clerk will adjourn court.